```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
                        EASTERN DIVISION


MARK WELCH,                    )
                               )
          Plaintiff,           )
                               )
     v.                        )    No. 4:07 CV 64 SNL
                               )                    DDN
MICHAEL J. ASTRUE,             )
Commissioner of                )
Social Security,               )
                               )
          Defendant.           )
```

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Mark Welch for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be reversed and remanded.

### I. BACKGROUND

Plaintiff Mark Welch was born on February 16, 1963. (Tr. 60.) He is 5'9" tall, with a weight that has ranged from 165 pounds to 175 pounds. (Tr. 91, 331.) He completed nine years of school, and can read and write English. He last worked as a decorator and stocker. (Tr. 91-100.)

On September 20, 2001, Welch filed for supplemental security income and disability insurance benefits, alleging he became disabled on May 1, 2000, as a result of recurrent depression, borderline intellectual functioning, low energy, a lack of motivation, a lack of ambition, rage, temper outbursts, homicidal ideation, sleep difficulty, poor concentration, mood swings, social withdrawal, difficulty making decisions, poor memory, low stress tolerance, and too much sleep. (Tr.

60, 63, 92.) The application was initially denied on February 26, 2002. (Tr. 16.) After a hearing on January 2, 2003, the ALJ denied benefits on February 25, 2003. (Tr. 13-27.) In his decision, the ALJ found Welch suffered from major recurrent depression, alcohol and marijuana addiction, and anti-social personality disorder. The ALJ found these impairments were severe, but ultimately concluded that Welch was not disabled, and could return to his past work. (Tr. 18, 22-23.) On August 26, 2003, the Appeals Council denied Welch's request for review. (Tr. 6.)

On appeal to the district court, the undersigned found the ALJ had not adequately evaluated Welch's disability under the Social Security regulations. (Tr. 242-244); Welch v. Barnhart, 355 F. Supp. 2d 1008, 1018 (E.D. Mo. 2005). In particular, the undersigned found the ALJ failed to include the effects of Welch's substance abuse in his initial disability determination. (Tr. 242-244.) After the district judge adopted the report and recommendation, the case was reversed and remanded to the ALJ. (Tr. 225.) On remand, the ALJ was to make a disability determination without initially excluding the effects of Welch's substance abuse. (Tr. 225, 245.)

On remand, the ALJ held a supplemental hearing on September 6, 2006. (Tr. 211J-M.) On September 20, 2006, the ALJ again denied benefits. (Tr. 211C-I.) The Appeals Council did not review the ALJ's decision within sixty days, making the ALJ's decision the final decision of the Commissioner. (Doc. 1 at ¶ 15; Doc. 16 at ¶ 1.)

## II. MEDICAL HISTORY AFTER JANUARY 2, 2003[1]

On February 12, 2003, Welch received an annual assessment and treatment plan. At the time of the assessment, Welch was under considerable stress, the result of legal problems, an unstable housing situation, and a lack of income. Welch had recently been kicked out of his parents' home, and was living with his brother. He had also missed

---

[1]Welch's medical history up to January 2, 2003, is covered in the court's earlier decision. See (Tr. 227-245); Welch, 355 F. Supp. 2d at 1009-19.

-2-

an appointment with his probation officer, which had resulted in a warrant for his arrest. According to the assessment, Welch's "depressive symptoms [have] shown little to no improvement this year." Welch displayed psychomotor agitation, and an inability to sit still and concentrate. He was also prone to irritability, difficulty sleeping, lack of motivation, and would isolate himself in the house. Welch received food stamps and Medicaid, and denied alcohol use. He was assigned a GAF score of 55.[2] (Tr. 341.)

On September 17, 2004, Kristyn Fantroy, MSW, LCSW, a clinical case manager, provided a psychosocial and clinical assessment of Welch. Fantroy noted Welch continued to have symptoms of depression and regular anger outbursts. His anger could be overwhelming at times. During this visit, Welch came to the interview with a bandaged forearm, having punched through a glass window. Fantroy noted that Welch "continues to need services with BJC [Barnes-Jewish Behavioral Health] so that he can have access to mental health treatment." At the time of the assessment, Welch noted having no motivation, feeling hopeless, and having mood swings. He denied any homicidal or suicidal ideation. His symptoms included agitation, an inability to sit still, an inability to focus or concentrate, irritability, depression, difficulty sleeping, isolation, outbursts of anger, and a lack of motivation. Welch had a history of substance abuse, and had attended Alcoholics Anonymous meetings, but tended to minimize his substance abuse. He was diagnosed with major depressive disorder, and alcohol abuse in remission, and assigned a GAF

---

[2]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

score of 50/55.[3] He had little social support, severe legal problems, and difficulty finding employment. He maintained good physical health. His next review was scheduled for February 2005. (Tr. 333-38.)

On June 2, 2005, police surrounded Welch's home, after Welch threatened a neighbor with a gun. Welch threatened to shoot the police and shoot himself if they did not leave, but ultimately surrendered and left the house. (Tr. 339-40.)

From June 3, 2005, to June 6, 2005, Dr. Fred Rottnek, M.D., examined Welch in the St. Louis County jail. At the time, Welch was complaining of depression. Dr. Rottnek noted a history of alcohol abuse, but that Welch drank less when taking his medications. A physical examination revealed Welch had good general health. In addition, Welch showed no signs of anxiety, hallucinations, or suicidal ideation. Dr. Rottnek noted that Welch suffered from alcohol abuse and major depressive affective disorder. (Tr. 355-61.)

On June 13, 2005, Fantroy completed another assessment of Welch. Fantroy described Welch's June 2 arrest. According to the assessment, Welch's mother stated that Welch frequently talked about committing suicide. Fantroy, on the other hand, had not heard Welch discuss suicide. Welch was still taking Trazodone and Zoloft, and his GAF was unchanged.[4] (Tr. 339-40.)

On June 17, 2005, Welch saw Todd Parker, PA, complaining of chest pain. On June 7, Welch had been punched in the chest by another inmate. He had ecchymosis, but this resolved.[5] Welch was to be reevaluated in two weeks. (Tr. 362-63.)

---

[3]On the GAF scale, a score of 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[4]Trazodone and Zoloft are each used to treat depression. http://www.webmd.com/drugs. (Last visited July 9, 2008).

[5]Ecchymosis refers to a purplish patch caused by blood passing out of the blood vessels and into the skin. Stedman's Medical Dictionary, 484, 553 (25th ed., Williams & Wilkins 1990).

-4-

On August 17, 2005, Barnes-Jewish Behavioral Health completed a discharge summary for Welch. Welch had been discharged because he was being incarcerated for probation violations. The discharge summary noted a history of alcohol and marijuana abuse. During his most recent admission, Welch noted difficulty sleeping, and having feelings of irritability, social withdrawal, and hopelessness. He denied any hallucinations, suicidal or homicidal ideation, and substance abuse. On discharge, Dr. El-Mashhady diagnosed Welch with major depressive disorder, severe family and social network problems, and assigned him a GAF score of 50. Welch's case manager recommended he continue taking Trazodone ane Zoloft. If Welch requested readmission in the future, he was to be reassessed. (Tr. 331-32.)

On June 16, 2006, Welch received an assessment at Barnes-Jewish Behavioral Health. His chief complaint was depression and a lack of motivation. He expressed an interest in putting his troubles behind him, and getting back on Zoloft and Trazodone. Welch noted no physical concerns and denied any pain. He said he was able to care for himself and his personal hygiene on a regular basis. He had no recent medical hospitalizations. He had shot himself in the head in 1995, but was intoxicated at the time, and said the accident was a result of carelessness, not an attempt at suicide. He did note excessive fatigue. The interviewer concluded that Welch was very focused on the past, rather than on the future, but showed no evidence of delusions, paranoia, psychosis, or prominent distortions.[6] The interviewer found Welch had major depression without psychotic features, generalized anxiety disorder, and a history of alcohol abuse. He noted no obvious symptoms of personality disorder, but that Welch suffered from severe legal and financial problems. He assigned Welch a GAF score of 54. (Tr. 322-27.)

On June 29, 2006, Welch was seen at Barnes-Jewish Behavioral Health. The progress notes indicate his chief complaint was depression. His mood was depressed, and he felt hopeless and helpless. Welch reported low concentration and low motivation. He was not in pain and he was noted to be physically healthy. (Tr. 329-30.)

---

[6]The interviewer's signature is illegible.

On July 27, 2006, Welch was seen at Barnes-Jewish Behavioral Health. The progress notes indicate he was taking Zoloft and Trazodone, and was having trouble with life issues and low self-esteem. He was prescribed Prozac and told to continue the Trazodone.[7] (Tr. 328.)

**Testimony at the Supplemental Hearing**

At the hearing on September 6, 2006, Welch noted that he had not worked or received any additional education or work training since the last hearing. He also did not believe he had regained the ability to work full time since the last hearing. (Tr. 369-74.)

Welch said he suffered from depression, which made it difficult for him to get motivated or concentrate. His lack of motivation, in turn, caused problems with his mother. Welch had few friends and did not belong to any clubs or organizations. Most people he met aggravated him. Medication helped him cope some of the time. (Tr. 374-78.)

In June 2005, Welch was arrested for failing to report to his probation officer. He said he stopped seeing his probation officer because he was unable to meet his child support obligations. Welch got out of jail in December 2005, but was under house arrest until February 2006. Welch returned to getting treatment at Barnes-Jewish Behavioral Health in June 2006; he attributed the four-month delay to difficulties getting signed up with Medicaid. (Tr. 378-80.)

Welch did not drink in jail, and since leaving jail, has only "had a few [drinks] here and there. Nothing like I was before." He simply did not have the same craving to drink. At the time of the hearing, Welch said he had not had a drink in seven or eight months. Yet, Welch remembered drinking from time to time when he was going through the process of getting Medicaid coverage (which was only a few months before the hearing). (Tr. 380-82.)

During the hearing, Kristyn Fantroy confirmed that Welch was not able to get treatment until he was covered by Medicaid. She believed

---

[7]Prozac is used to treat depression. http://www.webmd.com/drugs. (Last visited July 9, 2008).

Welch was trying to get help as quickly as possible once he got out of jail. (Tr. 382-84.)

### III. DECISION OF THE ALJ

On remand, the ALJ found Welch was not disabled as defined by the Social Security Act. In reaching this decision, the ALJ considered the documents in the record, the testimony at the supplemental hearing and the initial hearing, the order of remand, and the arguments presented. The ALJ also noted considering the claimant's own testimony, his appearance and demeanor, as well as medical reports and opinions from treating and examining sources. (Tr. 211C-D.)

In evaluating the evidence, the ALJ incorporated the summarized testimony and medical evidence from his previous decision on February 28, 2003. The ALJ also looked to evidence submitted since the time of the previous decision. In particular, the ALJ summarized Welch's testimony during the supplemental hearing. During the hearing, Welch expressed his feelings of depression, aggravation, and lack of motivation. Welch noted drinking substantially less alcohol from December 2005 to the time of the hearing. (Tr. 211D-F.)

The ALJ also reviewed the medical evidence from the time of remand. Welch saw Dr. Ahmad in February 2003, and noted being under stress, but was not suicidal or psychotic, and denied any alcohol or drug use within the past year. Welch received care in September 2004, where he noted his mood was better, and that he was not having any physical problems. He denied abusing alcohol. Welch saw a psychiatrist named El-Mashhady from September 2004 until January 2005. Welch received care in June 2006, where he reported no physical problems and an improved mood. He noted drinking alcohol only about once a week. (Tr. 211F-G.)

Reviewing this evidence, the ALJ found Welch had no credible, medically-established, long-term or significant physical impairments or limitations. The ALJ found Welch had some limitations related to chronic depression and personality disorder, but that these limitations would not limit his ability to perform his past work. When he took his medication, these limitations were even less pronounced. Welch's alcohol abuse did not change this conclusion. The ALJ found Welch "has never been

-7-

'disabled' and unable to work because of physical or other mental impairments, such as mood or personality disorders, <u>whether there is known ongoing substance abuse or not</u>." In addition, the ALJ found that Welch was not entirely credible, and that he had the RFC to perform the "physical exertional and nonexertional requirements of work except for mild to moderate limitations involving close or frequent contact with co-workers, supervisors or the general public, or having to do more than simple, repetitive tasks." Finally, the ALJ concluded that Welch did not have any uncontrollable substance abuse disorder, and that he was capable of performing his past, relevant work. (Tr. 211G-H.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision

is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

In this case, the Commissioner determined that Welch could perform his past work.

## V. DISCUSSION

Welch argues the ALJ's decision is not supported by substantial evidence. In particular, Welch argues the ALJ failed to properly consider the rules for determining the materiality of drug abuse and alcoholism. Welch also argues the ALJ improperly determined his residual functional capacity, and improperly determined that he could return to his past work.

**Evaluation of Alcohol Abuse**

Before considering the effects of a claimant's alcoholism, the ALJ must first determine whether the claimant is disabled. Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003) (citing 20 C.F.R. § 404.1535(a)). In other words, the ALJ should not exclude from the usual five-step framework the effects and symptoms of any substance abuse disorders. Id. Only after the ALJ has made an initial determination of disability, should the ALJ consider which limitations would remain after excluding the effects of the substance abuse disorders. Id. Of course, if the ALJ initially finds the claimant is not disabled, then there is no need to apply the special rules for alcoholism and drug addiction. Id. at 693.

In this case, the ALJ found Welch "has never been 'disabled' and unable to work because of physical or other mental impairments, such as mood or personality disorders, <u>whether there is known ongoing substance abuse or not</u>." (Tr. 211G.) Before excluding the effects of any ongoing substance abuse, the ALJ explicitly concluded that Welch was not disabled. This is exactly the type of determination required by Brueggemann. Having determined that Welch was not disabled, even with an ongoing substance abuse disorder, the ALJ was not required to proceed any further. Brueggemann, 348 F.3d at 693 ("A finding of disability is, in effect, a 'condition precedent' to applying the special rule on

alcoholism and drug addiction."). The ALJ properly followed the social security rules governing substance abuse.

**Residual Functional Capacity**

When deciding whether a claimant can engage in substantial employment, the ALJ must determine the claimant's RFC. Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). In making this determination, the ALJ must consider both the claimant's mental and physical impairments. Id. The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697. While the ALJ must determine a claimant's RFC, the claimant bears the burden of proving his RFC. Baldwin, 349 F.3d at 556.

The ALJ found that Welch was not entirely credible, and that he had the RFC to perform the "physical exertional and nonexertional requirements of work except for mild to moderate limitations involving close or frequent contact with co-workers, supervisors or the general public, or having to do more than simple, repetitive tasks." (Tr. 211H.) Substantial medical evidence supports these determinations.

From a physical standpoint, substantial medical evidence supports the ALJ's determination that Welch was able to perform the physical exertional requirements of work. In December 2001, Welch noted he had no difficulty preparing meals, shopping, mowing the lawn, or doing laundry or dishes. (Tr. 121, 123.) At the January 2003 hearing, Welch noted he did household chores, cooked, and cared for his disabled father. (Tr. 38-42.) In September 2004, Kristyn Fantroy noted Welch maintained good physical health. (Tr. 333-38.) In June 2005, Dr. Rottnek concluded

-10-

that Welch had good general health. (Tr. 355-61.) In June 2006, Welch noted that he was able to care for himself on a regular basis. (Tr. 322-27.) That same month, an examination showed he was not in pain and was physically healthy. (Tr. 329-30.) Substantial medical evidence supports the ALJ's physical RFC determination.

Substantial medical evidence also supports the ALJ's mental RFC determination. In March 2001, Dr. Aqeeb Ahmad found Welch was anxious and depressed, but had a logical and sequential thought process. (Tr. 155-58.) In February 2002, Dr. Richard Moreno found Welch had a moderate degree of limitation in maintaining social functioning, and maintaining concentration, persistence, and pace. Dr. Moreno also found Welch had no episodes of decompensation, and had no significant limitations in terms of understanding or remembering short and simple directions, carrying out short and simple instructions, making simple work-related decisions, and asking simple questions. See Rose v. Apfel, 181 F.3d 943, 945 (8th Cir. 1999) (finding claimant was not disabled because, among other reasons, she had not had any episodes of decompensation at work). Dr. Moreno found Welch was moderately limited in his ability to interact with the public, get along with co-workers, adapt to changes in the work environment, and maintain appropriate social behaviors. (Tr. 162-177.) In June 2002, Dr. Ahmad found Welch had moderate limitation in his ability to relate in social situations, interact with the public, accept instructions and criticism, maintain appropriate behavior, respond to work changes, and understand and remember simple instructions. (Tr. 182-85.) At the January 2003 hearing, Welch said he stopped working because the work slowed, and not because he was unable to handle the work. He also noted his main problem was with motivation. (Tr. 35-37.)

In September 2004, Fantroy noted Welch denied any homicidal or suicidal ideation. (Tr. 333-38.) In June 2005, Dr. Rottnek found Welch showed no signs of anxiety, hallucinations, or suicidal ideation. (Tr. 355-61.) In August 2005, Welch denied any hallucinations, suicidal or homicidal ideation, and substance abuse. (Tr. 331-32.) In June 2006, Welch expressed a desire to put his troubles behind him. He showed no evidence of delusions, paranoia, psychosis, or prominent distortions. He had no recent medical hospitalizations, no psychotic features, and no

obvious symptoms of personality disorder. (Tr. 322-27); see Rose, 181 F.3d at 945 (finding claimant was not disabled because, among other reasons, she had never been hospitalized for mental impairment or declared disabled because of a mental condition). At the supplemental hearing, he indicated he no longer had the craving to drink. (Tr. 380-82.) Substantial medical evidence supports the ALJ's mental RFC determination.

**Return to Past Work**

The ALJ determines a claimant's ability to perform past work by comparing the claimant's RFC to the physical and mental demands of the claimant's past work. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994). In making this comparison, the ALJ must detail the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's RFC. Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991). Taken together, "an ALJ has an obligation to fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant [himself] is capable of doing" before determining the claimant can perform his past relevant work. Id. at 1238. For a claim involving a mental or emotional impairment, the ALJ should obtain a precise description of the particular job duties likely to produce stress - such as speed, precision, complexity of tasks, independent judgment, and working with others - to determine if the claimant's mental impairment is compatible with the job. Id. A conclusory statement that the claimant can perform past work, without any explicit findings, does not constitute substantial evidence and will require remand. Id. at 1239.

In investigating the demands of a claimant's past work, the ALJ may rely on the claimant's description of his actual job, or may look to how the job is performed in the national economy. Stephens v. Shalala, 50 F.3d 538, 542 (8th Cir. 1995); Brinegar v. Barnhart, 358 F. Supp. 2d 847, 858 (E.D. Mo. 2005). "Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the

claimant is found not to be disabled." Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000). The Dictionary of Occupational Titles (DOT) describes the demands of a job as it is usually performed in the national economy. See Kirby v. Sullivan, 923 F.2d 1323, 1327 (8th Cir. 1991). The ALJ satisfies the duty to make explicit findings by expressly referring to the DOT's specific job description of the claimant's past work. Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999). The ALJ may also rely on vocational expert testimony to fulfill this obligation. Ramirez v. Astrue, No. 06-5126-CV-SW-W-SSA, 2008 WL 880167, at *3 (W.D. Mo. March 28, 2008).

The ALJ concluded Welch could return to his past work. In making this determination, the ALJ looked to Social Security Ruling 85-15, which sets out the mental demands of competitive, remunerative, unskilled work. (Tr. 219.) However, Social Security Ruling 85-15 speaks to situations where a claimant's mental impairment prevents the person from meeting the demands of past relevant work. SSR 85-15, 1983-1991 Soc. Sec. Rep. 343, 1985 WL 56857, at *4 (1985). In other words, the ruling "only applies if the claimant cannot return to his past relevant work." Derrig v. Chater, 905 F. Supp. 584, 602 (N.D. Iowa 1995).

In this case, the ALJ did not investigate the particular physical and mental demands of Welch's former jobs as he performed them, or consult the DOT to determine the physical and mental demands of Welch's former jobs as performed in the national economy. The ALJ only looked to Social Security Ruling 85-15 in concluding Welch could return to his past work - a ruling which did not even apply under the claimant's circumstances. Looking to the record, the ALJ failed to make explicit findings as to the physical and mental demands of Welch's past relevant work, as required by Groeper. The ALJ's opinion is therefore not supported by substantial evidence and must be remanded. See Pfitzner, 169 F.3d at 569 (remanding case where the ALJ failed to make specific findings as to the detailed demands of claimant's past relevant work); see also Maine v. Astrue, No. 4:07 CV 1074 CDP, 2008 WL 2224792, at *8 (E.D. Mo. May 27, 2008) (remanding case where there was only scarce and inconsistent evidence about the actual demands of claimant's past relevant work).

-13-

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g).  Upon remand, the ALJ should make specific findings as to the physical and mental demands of Welch's past relevant work.  The ALJ should inquire into the actual demands of Welch's former jobs or the demands of the jobs as performed in the national economy.  The ALJ should then compare Welch's residual functional capacity to the demands of his former jobs, and decide whether Welch is able to perform his past relevant work.

The parties are advised that they have ten days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


    /S/ David D. Noce    
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 26, 2008.